**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| VERTEX REFINING, NV, LLC, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| NATIONAL UNION FIRE INSURANCE ) | |
| COMPANY OF PITTSBURGH, PA, and ) | |
| ASSURANCE AGENCY, LTD., ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | **No. 16 C 3498** |
| ) | |
| ASSURANCE AGENCY, LTD., ) | Judge Rebecca R. Pallmeyer |
| ) | |
| **Third-Party Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| OMEGA HOLDINGS CO., LLC, RICK ) | |
| SILVERBERG, as Officer and Director of ) | |
| Omega Holdings Co., LLC, and JAMES ) | |
| GREGORY, as Officer and Director of ) | |
| Omega Holdings Co., LLC, ) | |
| ) | |
| **Third-Party Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

This dispute stems from a series of business transactions in which Plaintiff Vertex Refining, NV, LLC ("Vertex") acquired oil refining facilities and assets owned by Omega Holdings Company, LLC, Omega Refining, LLC, and Bango Refining, LLC (collectively, "Omega"). In late 2013, before a final deal was struck, one of Omega's "re-refineries," located in Bango, Nevada, was damaged in an explosion.[1] That facility was covered by a National Union Fire Insurance

---

[1] The parties have not explained what a "re-refinery" is, but the court's research suggests that it involves taking used motor oil and cleaning it so that it may be re-used. See http://www.ceptechnology.com/Re-Refining-Recycling (last visited March 16, 2019).

Company of Pittsburgh, PA ("National Union") insurance policy, purchased by Omega through Defendant Assurance Agency, Ltd. ("Assurance").

Early the next year, Vertex and Omega agreed upon an Asset Purchase Agreement that contemplated two closings—the first involving certain Omega assets, and the second involving the title to the Bango facility, once the facility met certain conditions. Part of that deal included an agreement that, in return for certain loan financing, Vertex would become a "lender's loss payee" on Omega's insurance policy claim for the Bango explosion. Assurance issued Vertex a Certificate of Insurance, confirming Vertex's status as a lender's loss payee, but never communicated that status to National Union, and no insurance checks were issued payable to Vertex. Ultimately, the Bango facility never met the requirements for the closing, and Vertex backed out of the deal. Omega filed for bankruptcy in March 2016. That same month, Vertex filed this lawsuit against National Union and Assurance to recover the insurance payments it claims it should have received as a lender's loss payee. National Union has since been dismissed from this lawsuit [168], and Assurance moves for summary judgment on all remaining counts. That motion is denied.

## BACKGROUND

### I.   Asset Purchase Agreement and Closing

In 2013, Plaintiff Vertex began discussions with Omega about Vertex's possible acquisition of "some or all" of Omega's "oil re-refining facilities." (Vertex's Statement of Undisputed Facts ("Vertex SOF") [125] ¶ 12.) Omega operated two re-refining facilities—one in Marrero, Louisiana, and one in Bango, Nevada—and a "business selling and distributing various blended oils called CAM2."[2] (Vertex's Add'l Proposed Statements of Fact ("Vertex Add'l SOF")

---

[2]   Omega also operated another plant that blended lube oils. That plant was not part of the Vertex-Omega deal. (Silverberg Deposition, Exhibit 1 to National Union SOF [120-2], at 173:4–5, 11–12.)

[151] ¶ 1.)  In December 2013, before any deal was finalized, an explosion at the Bango facility damaged the property.  (Vertex SOF [125] ¶ 14.)  The Bango property was insured by National Union under Policy No. 63818290.  (Vertex SOF [125] ¶ 14; National Union Insurance Policy, Exhibit 52 to National Union SOF [120-53].)  Omega had purchased that policy through Defendant Assurance, an "insurance producer," effective April 30, 2013.  (Assurance Local Rule 56.1 Statement ("Assurance SOF") [128] ¶ 4.)  Omega filed its insurance claim on December 9, 2013, and on December 11, it "hired Auslander and Associates," a "public adjuster[,] to assist in the recovery of insurance proceeds relating to the [l]oss."  (Assurance SOF [128] ¶¶ 5–6.)  The insurance policy covered both property/casualty losses and business interruption losses.

By early 2014, Omega was in financial trouble, having defaulted on one loan from Guggenheim Corporate Funding, LLC, and owing money to other lenders.  (Assurance Resp. to Vertex Add'l SOF [162] ¶ 2.)  Despite these issues, talks between Vertex and Omega continued. In March 2014, the parties executed an Asset Purchase Agreement ("Agreement").  (Assurance SOF [128] ¶ 8; Asset Purchase Agreement, Exhibit 29 to National Union SOF [120-30].)  Three amendments to the Agreement followed, with the third and final amendment executed on May 2, 2014.  (Assurance SOF [128] ¶ 8; Third Amendment, Exhibit 30 to National Union SOF [120-31].) The final version of the Agreement included a Deposit Account Control Agreement ("DACA"), which would give Vertex access to two Omega bank accounts at Wells Fargo.  (Carlson Deposition, Exhibit 20 to National Union SOF [120-21], at 107:18–108:7, 109:16.  *See* Deposit Account Control Agreement, Exhibit 31 to National Union SOF [120-32].)  The Agreement also included what Vertex refers to as a loan[3] from Vertex to Omega "in the face amount of

---

[3]     Assurance, who was not involved in this aspect of the transaction, "disputes that any of the cash paid to Omega on May 2, 2014 was in the form of a loan."  (Assurance Resp. to Vertex Add'l SOF [162] ¶ 40.)  It instead asserts that "the first time [Vertex] loaned any money to Omega was a $3.15 million draw loan in July 2014."  (Assurance Reply Brief in Support of its Motion for Summary Judgment [160], at 6.)  The evidence on which Assurance relies, however, establishes only that Vertex acknowledges it made no loans to Omega prior to May 2, 2014 and asserts that it made a "draw loan" to Omega in July 2014; that evidence does not establish the

$13,858,066.67, the main components of which were a $7,558,066.67 Purchase Price Loan and a $3,150,000 Draw Loan." (Vertex Add'l SOF [151] ¶ 68.  *See* Agreement for Acceptance of Certain Collateral in Partial Satisfaction of Obligations, Exhibit C to Carlson Declaration [153-3].) The transaction included a Secured Promissory Note requiring Omega to "retain and use CDG Group, LLC ('CDG') as a financial advisor in order to monitor Omega's accounts, bookkeeping, and reporting functions, as well as to provide routine cash flow forecasts and other reports of Omega's finances to Vertex." (Assurance SOF [128] ¶ 18.  *See* Secured Promissory Note § 5.1, Exhibit D to Assurance SOF [128], at PageID # 3505 (noting that CDG would continue "in the same role and with the same duties and responsibilities that CDG has on the date hereof"[4]).)

Vertex's Chief Financial Officer, Chris Carlson, states that he understood, "pursuant to the Asset Purchase Agreement, the Secured Promissory Note and related agreements, [that] Vertex had a first security and priority interest in all business interruption proceeds to be paid by National Union as a result of" the Bango insurance claim. (Carlson Declaration [153] ¶ 5.)[5]  Another Omega Creditor, BBB Funding, LLC, had a "first security and priority interest in the right to receive the property/casualty insurance proceeds." (Vertex Add'l SOF [151] ¶ 13.)  Assurance disputes Carlson's understanding of the Agreement as "an improper legal interpretation or conclusion from a contract." (Assurance Resp. to Vertex Add'l SOF [162] ¶ 13.)  The Third Amendment to the Asset Purchase Agreement itself provides that Vertex has a

---

date when the first loan from Vertex to Omega took place. (*See* Vertex Response to Assurance SOF [147] ¶ 14; Vertex Add'l SOF [151] ¶ 41.)  Ric Silverberg, CEO of Omega, described his understanding of the transaction this way: "[B]asically they [Vertex] were loaning us money to stay afloat so they could get this thing closed." (Silverberg Deposition, Exhibit 1 to National Union SOF [120-2], at 183:14–15.)

[4]     CDG had already been retained by Omega pursuant to an agreement between Omega and its Guggenheim creditor. (Vertex Add'l SOF [151] ¶ 2.)

[5]     Carlson also states that he believed that "the business interruption proceeds" from Omega's Bango insurance claim "would pay down the draw loan," and that "the purchase price loan was to be secured by the rebuilt Bango Facility." (Carlson Declaration [153] ¶ 5.)

> first priority lien, security interest and mortgage on all of Bango Refining's assets, except for Bango Refining's rights in the property and casualty insurance proceeds, in which case [Vertex] shall have a second lien (junior only to BBB Funding, LLC's lien in an amount not to exceed $1.5 million in the aggregate . . . .[6]

(Schedule 1 to the Third Amendment, Exhibit 30 to National Union SOF [120-31], at PageID #2201.)  The final Agreement called for two separate closings of the purchase agreement in order to minimize Vertex's risk from the recently-damaged Bango facility.  (*See* Assurance SOF [128] ¶ 9; Deposition of Alvaro Ruiz, Exhibit E to Assurance SOF [128-5], at 36:15–37:2.)  At the first closing, which took place on May 2, 2014, Vertex paid Omega $30.75 million, funded by a loan to Vertex from Goldman Sachs Bank USA ("Goldman").[7]  (Vertex Add'l SOF [151] ¶ 8; Assurance Resp. to Vertex Add'l SOF [162] ¶¶ 3, 8; Asset Purchase Agreement, Exhibit F to Carlson Declaration [153-6], at 1.)  The first closing involved Vertex's acquisition of Omega's Marrero, Louisiana facility.  (Assurance Resp. to Vertex Add'l SOF [162] ¶ 3.)  Assurance and Vertex dispute whether the first closing involved any exchange of money with respect to the Bango facility.  (*Compare* Vertex Add'l SOF [151] ¶ 7 ("As part of the initial closing on May 2, 2014, Vertex paid $14,677,793.67 for the Bango Road facility . . . and assets, but it did not take legal title to those assets.") *and* Asset Purchase Agreement, Exhibit F to Carlson Declaration [153-6], at 3 (showing a "purchase price allocation" for "Bango refining assets" of $14,677,793.67) *with* Assurance Resp. to Vertex Add'l SOF [162] ¶ 7 (acknowledging that the Asset Purchase Agreement included "two separate closings" but disputing, without pointing to any additional evidence, that the "remaining asserted facts . . . [are] legal interpretations and opinions of a contract").)

---

[6]     The parties do not dispute that Omega never fully paid BBB.  (Assurance Resp. to Vertex Add'l SOF [162] ¶ 17.)

[7]     Assurance disputes "the amounts asserted . . . in that they are improper legal conclusions of the Asset-Purchase Agreement."  (Assurance Resp. to Vertex Add'l SOF [162] ¶ 8.)  )  Assurance provides no counter-evidence drawing the amount of the Vertex payment into question.

As a result of the first closing, several Omega employees became Vertex employees. James Gregory was a part-owner of Omega, member of Omega's Board of Directors, and had served as legal counsel for Omega since 2008; he joined Vertex as General Counsel and as a member of its Board of Directors. (Vertex Resp. to Assurance SOF [147] ¶ 16; Assurance Resp. to Vertex Add'l SOF [162] ¶¶ 5, 34, 36.) David Peel, Omega's Chief Operating Officer, joined Vertex as Chief Operating Officer.[8] (Vertex Resp. to Assurance SOF [147] ¶ 17.) And Ric Silverberg, CEO and part-owner of Omega, became a consultant for Vertex.[9] (Assurance Resp. to Vertex Add'l SOF [162] ¶¶ 5, 34, 35.) Each of these individuals continued to do some work on behalf of Omega, despite their employment at Vertex, and they continued to receive compensation from Omega. (*Id.* at ¶ 34.) Mr. Gregory also remained on the Omega board of directors. (Vertex Resp. to Assurance SOF [147] ¶ 39.)

After the May 2 closing, Omega's financial advisor, CDG, provided "routine cash flow forecasts and other reports of Omega's finances" to various parties, including "all of the participants in the finance group" (Ek Deposition, Exhibit F to Assurance SOF [128-6], at 14:1–2), and, at least part of the time, to Gregory, Silverberg, and Carlson. (Assurance SOF [128] ¶ 18; Vertex Resp. to Assurance SOF [147] ¶ 18; Ek Deposition, Exhibit F to Assurance SOF [128-6], at 14:7–13.) Assurance asserts that CDG employee Eric Ek "provided at least 13 period fund flow reports," which provided information about Omega's financial circumstances on a periodic basis, "directly to Vertex's CFO, Chris Carlson" after May 2, 2014. (Assurance Memo in Support of MSJ [129], at 8. *See also, for example*, Omega Update Week Ending 6/13, Exhibit 86 to Exhibit

---

[8]     Mr. Peel was subject to an Administrative Services Agreement, which permitted "certain Omega employees [to] continue to work for Omega in support of its operations after the May 2, 2014 closing." (Vertex Resp. to Assurance SOF [147] ¶ 15. *See* Administrative Services Agreement, Exhibit 36 to National Union SOF [120-37].) Mr. Gregory and Mr. Silverberg do not appear to have been subject to the Administrative Services Agreement.

[9]     Other Omega employees also joined Vertex following the closing, but their roles are not important for the resolution of this dispute.

D to Assurance SOF [128-4], at PageID # 3570.)  Mr. Ek and CDG also conducted some conference calls with various parties, as required by the Promissory Note.  (Vertex Resp. to Assurance SOF [147] ¶¶ 18, 21; Secured Promissory Note § 5.1, Exhibit D to Assurance SOF [128], at PageID # 3505; Assurance SOF [128] ¶ 21).  The parties debate how frequently, and when, these calls were held, and Vertex claims that even "[w]hen the calls did occur, Vertex did not always participate."  (Vertex Resp. to Assurance SOF [147] ¶ 21.)

## II.  Vertex's Designation as a Lender's Loss Payee

Leading up to the May 2 closing, Vertex sought the assignment of Omega's Bango insurance claim.  (Assurance Resp. to Vertex Add'l SOF [162] ¶ 21.)  Assurance representative Doug Nelson "informed Vertex that" such an assignment "was not in the best interest of either Omega or Vertex," and "Vertex's own broker agreed with Assurance's assessment."  (*Id.*)  Instead, "it was ultimately determined that Vertex could be added as a lenders [sic] loss payee under the policy, which would in turn allow for the proceeds under the policy to be assigned to Vertex."  (*Id.* at ¶ 22.)[10]  "On April 29, 2014, Vertex's counsel requested that Gregory, on behalf of Omega, cause Vertex to be added to the insurance policy as a lenders [sic] loss payee.  Omega then contacted Doug Nelson at Assurance and requested Vertex be added to the policy . . . ."  (*Id.* at ¶ 23.)  Jennifer Tuazon, a senior client services representative at Assurance, prepared a Certificate of Insurance and Evidence of Property Insurance ("Certificate of Insurance") naming Vertex as a lender's loss payee.  (Certificate of Insurance, Exhibit O to Declaration of David O. Krier [126-15], at PageID #3110–11; Tuazon Deposition, Exhibit 54 to National Union SOF [120-55], at 42:16–23.)  She e-mailed the Certificate of Insurance to Doug Nelson, who in turn e-mailed the documents to Jessen Gregory, "outside counsel for Omega."  (E-mail Chain, Exhibit O to Declaration of David O. Krier [126-15], at PageID #3108; Nelson Deposition, Exhibit P to

---

[10]     The parties have not explained how or why the "lender's loss payee" arrangement was more advantageous than a direct assignment.

Declaration of David O. Krier [126-16], at 83:24.)  The Certificate was then passed along to "Carlson and others associated with Vertex."  (Vertex Add'l SOF [151] ¶ 27.)  Assurance does not dispute that "based on the certificate of insurance, Vertex was listed as a Lender [sic] Loss Payee from April 30, 2014 until May 6, 2014 as indicated on the certificate of insurance."[11]  (Assurance Resp. to Vertex Add'l SOF [162] ¶ 25.)

Meghan Duke, Vice President for Business Process at Assurance, described at her deposition the normal process for adding a lender's loss payee to a policy.  When a client requests a certificate of insurance,

> [w]ithin that request, there may be a piece of it that requires something additional be added to the policy, like a lender's loss payee endorsement.  In that case, we would issue the certificate as normal per the certificate issuance process. . . . And then . . . if an endorsement were required . . . we would then send a notification to the carrier requesting that that be added to the policy . . . .

(Duke Deposition, Exhibit 55 to National Union SOF [120-56], at 10:3–6.)  She further explained that the typical process would involve following up on the endorsement request to ensure that it had been received.  (*Id.* at 11:2–5.)

That typical process was evidently not followed in this case.  Tuazon stated at her deposition that she did not communicate with National Union about an endorsement for Vertex's status as a lender's loss payee because Omega's National Union "policy was expiring" on May 6, 2014, just a few days after she issued the Certificate.  (Tuazon Deposition, Exhibit 54 to National Union SOF [120-55], at 42:24–43:4, 43:19–21 44:3–6, 44:15.)  Neither she nor the parties explain why the expiration date of the policy would eliminate the need to notify the insurance carrier of Vertex's new status.  (*See id.* at 44:7–13 ("Q.  Under the policies in the policy manual with regard to issuing certificates and additional interests to policies, is there anything—are there any

---

[11]    Despite this statement in its response to Vertex's Additional Statement of Facts, Assurance's briefing contends that Vertex cannot rely on the Certificate of Insurance to argue that it is a lender's loss payee on the insurance policy.  These issues will be addressed later in this opinion, but the court notes here that Assurance's representations appear to be inconsistent.

guidelines or rules as far as what you're supposed to do after issuing such a certificate? A. Like I said, it would be notifying the carrier to update the policy.").) It is undisputed that National Union did not issue any policy endorsement recognizing Vertex's status as a lender's loss payee before National Union began issuing the business interruption payments in June 2014. In February 2015—after all of the business interruption proceeds had been paid to Omega—National Union eventually issued an official endorsement listing Vertex as lender's loss payee, effective April 30, 2014. (Endorsement 9, Exhibit 57 to National Union SOF [120-58]; Vertex SOF [125] ¶ 39.)

Vertex claims that, pursuant to the terms of Omega's National Union insurance policy, the Certificate of Insurance automatically granted Vertex lender's-loss-payee status, and that no endorsement from National Union was required for that status to take effect. The Policy contains a Certificate of Insurance Clause that states: "All parties to whom a Certificate of Insurance has been issued are automatically added to this policy . . . in accordance with the terms and conditions of said Certificates. . . . [N]o inadvertent error or omission in [filing copies of certificates] . . . will prejudice either the Insured and/or the certificate holders." (National Union Insurance Policy, Exhibit 52 to National Union SOF [120-53], at PageID #2574). Assurance responds by noting that the Certificate of Insurance itself, in bold and all capital letters, states: "this evidence of property insurance is issued as a matter of information only and confers no rights upon the additional interest named below. This evidence does not affirmatively or negatively amend, extend or alter the coverage afforded by the policies below." (Certificate of Insurance, Exhibit O to Declaration of David O. Krier [126-15], at PageID #3111 (capitalization altered).) Neither party identifies any part of the insurance policy, nor any other written document in evidence, that affirmatively requires such an endorsement.

### III.  Business Interruption Insurance Payments

At the time of the May Agreement and closing, Vertex claims that "it was generally understood that the substantiation and payment of the business interruption claim would take many months." (Vertex Resp. to Assurance SOF [147] ¶ 28. *See* Ek Deposition, Exhibit 28 to

National Union SOF [120-29], at 155:21–156:20.)  In fact, however, the insurance policy claim proceeds at issue began to arrive to Omega as early as June 2014.  (Vertex Resp. to Assurance SOF [147] ¶ 31.)  These are payments that Vertex asserts it should have received.  (Vertex Memo in Opposition to Assurance MSJ [149], at 3.)

Issuance of the first National Union check was initiated shortly after the May closing.  "On May 28, 2014, Auslander [the adjuster hired by Omega] sent electronic correspondence to Gregory and Peel attaching the Sworn Statement of Proof of Loss for Partial Payment #4[12] in the amount of $1,000,000 for review and signature."  (Vertex Resp. to Assurance SOF [147] ¶ 29.)  Gregory responded to Auslander on June 2, "attaching the signed and notarized Sworn Statement of Proof . . . ."  (*Id.* at ¶ 30.)  National Union check no. 26493495, dated June 14, 2014, was made out to "Omega Holdings Company LLC and Wells Fargo Bank and Carter Auslander & Associate, s [sic]" for $1,000,000.  (*Id.* ¶ 31; Check Copy, Exhibit E to Declaration of Ryan Stippich [154-5].)  Auslander delivered a copy of the check to Gregory and Peel via "electronic correspondence."[13]  (*Id.*)  Vertex notes that the nature of these insurance proceeds (whether business interruption or property damage) is not clear from the check itself nor from the communications surrounding it.  Vertex claims that it[14] believed, at this point, that "any reference to 'insurance proceeds' in a generic manner was referring to property insurance proceeds," not to business interruption proceeds.  (Vertex Resp. to Assurance SOF [147] ¶ 32.)

On June 22, Eric Ek of CDG copied Gregory and Silverberg on an email containing a financial report  for the week ending June 13, 2014.  (Ek E-mail 6/22/2014, Exhibit 86 to Exhibit

---

[12]     The court understands that any prior National Union payments are not in dispute.

[13]     The parties have not explained which payee deposited the check, but it was neither issued to nor deposited by Vertex.

[14]     Vertex's briefing here refers generally to the company.  It does not indicate which officer of the company held this belief.  (Vertex Resp. to Vertex SOF [147] ¶ 32.)

D to Assurance SOF [128-4], at PageID #3568 ("Attached is the weekly report we just delivered to Vertex and Goldman.").)  That report projected that the $1 million insurance payment would "clear the bank by June 23rd, 2014 and Omega will be [sic] use the funds to meet overdue obligations."  (*Id.* at PageID #3572.)  Ek confirmed the $1 million dollar insurance payment's deposit in his report for the week ending July 4, 2014.  (Vertex Resp. to Assurance SOF [147] ¶ 33.)

Auslander notified Gregory and Peel that the next insurance payment was ready on July 23, 2014.  (Vertex Resp. to Assurance SOF [147] ¶ 34.)  Dated August 2, 2014, the check was made out to "Omega Holdings Company LLC and Carter Auslander & Associates" for $2,041,248.00.  (Check Copy, Exhibit 37 to Exhibit H to Assurance SOF [128-8], at PageID # 4022.)  The statement accompanying this check, unlike the statement accompanying the prior check, notes that the check is "partial payment for business income loss."[15]  (*Id.*)  Gregory, Silverberg, and Peel, among others, were copied on an email to Ek containing a copy of National Union check No. 26810692 on August 5, 2014.[16]  (E-mail 8/5/14, Exhibit 37 to Exhibit H to Assurance SOF [128-8], at PageID #4021.)  Vertex acknowledges that this check was deposited into an Omega account covered by the Deposit Account Control Agreement ("DACA") but notes that "the funds were immediately (the same day) transferred to a different account that was not subject to the DACA."  (Vertex Resp. to Assurance SOF [147] ¶ 27 (citing Wells Fargo Account Summary, Exhibit 33 to National Union SOF [120-34]).)

---

[15]  National Union sent Omega a separate check for $198,987.00 on the same date. That check was for "partial payment for property damage."  (Check Copy, Exhibit 37 to Exhibit H to Assurance SOF [128], at PageID #4023.)  Vertex claims this check is "immaterial" because it is "specific to property damage and, therefore, irrelevant to the business interruption loss." (Vertex Resp. to Assurance SOF [147] ¶ 39.)

[16]  Mr. Gregory was also copied on an email from Auslander & Associates dated August 14, containing another copy of the same check.  (*See* E-mail 8/4/14, Exhibit 66 to Exhibit D to Assurance SOF [128-4], at PageID #3371.)

Ek again noted the pending payment in his next financial report. (*See* Report Attached to Ek Email 8/6/14, Exhibit 189 to Exhibit G to Assurance SOF [128], at PageID # 3908 ("The insurance broker has received checks in the amount of $2,240,235 of which $2,041,248 is related to the Business Interruption claim and $198,987 is an advance towards the property claim.").) This report was sent to Carlson, but not Gregory and Peel. In his report for the week ending August 15, 2014, Ek confirmed receipt of the insurance payment. (Vertex Resp. to Assurance SOF [147] ¶ 40.) Ek's report dated October 18, 2014, sent to Carlson, Gregory, and Silverberg, reported that the August "business interruption proceeds" were used by Omega "for reimbursement of those related costs . . . ." (Report attached to E-mail 10/18/14, Exhibit 88 to Exhibit D to Assurance SOF [128-4], at PageID # 3618.)

Auslander sent Gregory a copy of the third and apparently final National Union business interruption check on October 22, 2014.[17] (Vertex Resp. to Assurance SOF [147] ¶ 49.) This check, again made out to Omega and Auslander & Associates, was dated October 21, 2014 and included $1,410,257.00 for "[p]ayment for the business interruption loss." (Check Copy, Exhibit 68 to Exhibit D to Assurance SOF [128-8], at PageID #3383.) Assurance has not identified any specific Ek report that references these claim proceeds.

The involvement of employees holding positions at both Omega and Vertex in this payment-receipt process is significant. In particular, Gregory appears to have played a primary role in Omega's receipt of insurance proceeds. Assurance asserts that Gregory, as General Counsel and as a member of Vertex's Board of Directors, "owed Vertex fiduciary duties" when he received the National Union claim payments and Ek's financial reports. (Assurance Resp. to Vertex Add'l SOF [162] ¶ 36.) Vertex, however, disputes that Gregory was "working on behalf of

---

[17]     National Union sent another check dated October 15, 2014 for $1,241,645 specifically for property damage. (*See* Check Copy, Exhibit 67 to Exhibit D to Assurance SOF [128], at PageID #3378; Vertex Resp. to Assurance SOF [147] ¶ 47.)

Vertex with regard to the insurance claim," at any relevant time: when Gregory signed the statement of proof, when Gregory and Peel received payment checks, or when Gregory participated in any CDG phone calls. (Vertex Resp. to Assurance SOF [147] ¶¶ 30, 31.) Assurance admits that "[w]hen working with Silverberg and Gregory, both CDG and Assurance believed that Silverberg and Gregory were working on behalf of Omega." (*Id.* at ¶ 37.) Similarly, Vertex asserts, and Assurance does not dispute, that "Silverberg never performed any consulting work on behalf of Vertex with regard to any aspect of Omega, and he kept his roles with both entities separate." (Assurance Resp. to Vertex Add'l SOF [162] ¶ 35.) Finally, it is undisputed that Peel, who was not involved in any of the Omega-Vertex deal-making, "was unaware that Vertex had a first security and priority interest in the business interruption proceeds." (Assurance Resp. to Vertex Add'l SOF [162] ¶ 33.) There is no other basis for concluding that Peel would have been aware that insurance checks should have been made out to Vertex.

Carlson's role in the receipt of Ek's reports is also a point of contention between the parties. Assurance insists that Carlson knew Omega was receiving checks from National Union, given the information he received from CDG. (*See* Deposition of Eric Ek, Exhibit F to Assurance SOF [128-6], at 14:14–21 ("Q. Do you recall having conversations with any individuals at Vertex regarding the projections? . . . A. I had several conversations with Chris Carlson, who is the chief financial officer of Vertex, with respect to our projections throughout the engagement.").) Vertex claims, however, that Carlson "did not review the information regarding the insurance claim and proceeds after receiving the report, as his only concern was making sure Goldman was receiving the projections." (Vertex Resp. to Assurance SOF [147] ¶¶ 38, 40; Carlson Deposition, Exhibit 20 to National Union SOF [120-21], at 69:4–71:12 (testifying that, "typically," when he received reports from CDG, he would "just make sure Goldman was copied and that they were getting the information").)

## IV. Vertex Grows Concerned

Carlson confirmed in his declaration that "[a]fter the initial closing on May 2, 2014, [he] was not concerned with Omega's financial condition, considering it had received a significant amount of cash from" the closing.  (Carlson Declaration [153] ¶ 7.)  He explained that he "did not think it was necessary to review the weekly reports prepared by . . . Ek . . . unless a concern was raised in the accompanying email or if Vertex's lender, Goldman Sachs, raised a concern."  (*Id.*) Thus, though he does not dispute receiving Mr. Ek's financial reports, Carlson describes his principal concern with the reports as ensuring that Goldman Sachs received them, and not actually reading them.  (Vertex Resp. to Assurance SOF 1[47] ¶ 23.)

In late 2014, however, Carlson began to grow concerned about Omega's finances when Omega informed Vertex "that there would be a delay in the start-up of the Bango facility and that it was having issues paying other creditors."  (Carlson Declaration [153] ¶ 8.)  On receiving this news, Carlson started reviewing the CDG reports "[a]round October 2014," primarily focused, he claims, "on Omega's debt related to [sic] Bango Facility that would still be owed after the anticipated second closing." (*Id.* at ¶ 12.)  Despite these concerns, Mr. Gregory recalls that Vertex and Omega continued to work toward closing on the Bango facility at the end of 2014.  (Gregory Deposition, Exhibit D to Assurance SOF [128], at 90:21–24.)  a

Carlson claims that "[a]t no time during 2014[ ] was [he] aware that Omega had received a business interruption payment check in August 2014."  (Carlson Declaration [152] ¶ 11.)  In fact, he states that he "did not become aware of the prior business interruption payments until February 2015." (Carlson Declaration [153] ¶ 13.)  On February 27, 2015, Vertex's counsel sent a letter to Doug Nelson of Assurance and Ross Auslander of Auslander & Associates requesting that Vertex be named "on all claim payments and/or advances to the Insured that include any business interruption insurance component," or that the "payments/advances [be made] directly to Vertex." (Letter 2/27/15, Exhibit 69 to Exhibit C to Assurance SOF [128], at PageID #3310.)  That same

month, National Union at last issued Endorsement No. 9 naming Vertex a lender's loss payee on the Policy.

Vertex ultimately terminated the agreement to purchase. (Gregory Deposition, Exhibit D to Assurance SOF [128], at 96:25–97:5.) "The second closing never took place, as Bango never met the conditions required under the Asset Purchase Agreement to initiate the closing. Omega failed to get the Bango Facility operating at the parameters required and was unable to transfer the assets free and clear of liens or other encumbrances." (Vertex Add'l SOF [151] ¶ 19; Assurance Resp. to Vertex Add'l SOF [162] ¶ 19.)

## V. Procedural Background

Vertex filed this lawsuit on March 22, 2016. Through its Amended Complaint [21], Vertex seeks "to recover damages for" Assurance and National Union's failure to designate Vertex . . . as a payee of insurance claim proceeds and for Defendant National Union's failure to pay insurance claim proceeds to Vertex . . . ." (Am. Compl. [21] ¶ 1.) Vertex and National Union have stipulated to National Union's dismissal from this suit [168], resolving Counts I and IV of the Amended Complaint. Three Counts remain against Assurance: Count II alleges that Assurance was negligent in carrying out its duty to Vertex. Count III charges Assurance with negligent misrepresentation. And Count V alleges that Assurance breached its contract with Omega, of which Vertex was a third-party beneficiary. Assurance moves for summary judgment [121] on all counts.

## DISCUSSION

## I. Legal Standard

"Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Hess v. Bd. of Trustees of S. Illinois Univ*., 839 F.3d 668, 673 (7th Cir. 2016) (citing Fed. R. Civ. P. 56(a)). A genuine dispute of material fact "exists when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which it bears the burden of

proof." *Grant v. Trustees of Indiana Univ*., 870 F.3d 562, 568 (7th Cir. 2017), *reh'g and suggestion for reh'g en banc denied* (Sept. 28, 2017) (citing *Packer v. Tr. of Indiana Univ. Sch. of Med.*, 800 F.3d 843, 847 (7th Cir. 2015)). In reviewing the evidence, the court must "constru[e] all facts, and draw[ ] all reasonable inferences . . . in favor of the non-moving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (quoting *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir.2008)).

In this district, a party moving for summary judgment must submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." Local Rule 56.1(a)(3). The movant is also required to submit "a supporting memorandum of law." Local Rule 56.1(a)(2). *See* Local Rule 56.1(b) (setting forth requirements for parties opposing summary judgment). As this court explained in *Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000), "[a] memorandum in support of (or in opposition to) summary judgment preferably contains two major parts: a fact section and an analysis section." *Id.* at 585. "[T]he analysis section should contain a review of the relevant legal standards supported by citation to caselaw and a thorough application of that law to the specific facts of the case." *Id.* Assurance's memorandum in support of its motion for summary judgment fails to lay out relevant legal standards or frameworks, and it is devoid of substantive citations to the caselaw, citing only one case in support of its eight-page legal argument.

For its part, Vertex's response brief lacks a facts section. *See Malec*, 191 F.R.D. at 585. But its memorandum makes legal arguments in response to Assurance, while also insisting that Assurance's inadequate filing should result in the waiver of Assurance's contentions. The court will not consider Assurance's summary judgment arguments waived solely based on the lack of reference to legal standards. The two cases that Vertex primarily relies on do not support its contention that the court should consider an entire motion for summary judgment waived. *See Rahn v. Bd. of Trustees of N. Illinois Univ.*, 803 F.3d 285, 290 (7th Cir. 2015) (finding that an argument was waived on appeal in an employment discrimination case, when the argument was not raised properly in the district court); *Purepecha Enterprises, Inc. v. El Matador Spices & Dry*

*Chiles*, No. 11 C 2569, 2012 WL 3686776, at *14 (N.D. Ill. Aug. 24, 2012) (finding waiver of a single argument, among several, in support of summary judgment, when the movant's "legal argument . . . [was] one sentence long and contain[ed] no citations to the record or pertinent legal authority except for a general citation to [a] statute.   The court agrees, however, that "[i]t is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel."  *Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996), *amended* (Mar. 28, 1996) (quoting *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir.1986), *cert. denied*, 479 U.S. 1056 (1987)).

## II.     The Certificate of Insurance

Key to this lawsuit is Vertex's status as a lender's loss payee.  Assurance cites a single 1991 Illinois Appellate Court case, discussed below, to argue that "Illinois law makes clear that a Certificate of Insurance . . . does not convey any rights to the certificate holder."  (Assurance Memo in Support of MSJ [129], at 11.)  Thus, Assurance argues that Vertex was "not a Lender's Loss Payee at the time of the subject claim payments" and was not entitled to any of the insurance payments.  (*Id.* at 11.)

As noted earlier, the Certificate itself contains disclaimer language:  The Certificate states that it "confers no rights upon the additional interest named below" and that it "does not affirmatively or negatively amend, extend or alter the coverage afforded by the policies below." (Certificate of Insurance, Exhibit O to Declaration of David O. Krier [126-15], at PageID #3111 (capitalization altered).)  Another portion of the Certificate states:

> The policies of insurance listed below have been issued to the insured named above for the policy period indicated.  Notwithstanding any requirement, term or condition of any contract or other document with respect to which this evidence of property insurance may be used or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies.

(*Id.*)  The First Appellate District of Illinois interpreted nearly identical disclaimer language in the case to which Assurance cites, *Pekin Ins. Co. v. American Country Ins. Co.*, 213 Ill. App. 3d 543,

572 N.E.2d 1112 (1st Dist. 1991). There, the insurer of a subcontractor issued a Certificate of Insurance to a general contractor, Ulbrich & Associates. Ulbrich was named as an "additional insured" on the Certificate.[18] That Certificate contained terms that did not match the underlying policy, and the legal question was not whether the Certificate gave Ulbrich insurance coverage, but rather what the terms of that coverage would be if the Certificate of Insurance and the underlying policy conflicted. The court determined that the Certificate "conveyed no rights to the certificate holder," and instead directed the parties to look to the underlying insurance policy to determine the terms of Ulbrich's coverage. *Pekin*, 213 Ill. App. 3d at 547, 572 N.E.2d at 1114. *See id.* 213 Ill. App. 3d at 547–48, 572 N.E.2d at 1115 (explaining that "the certificate . . . only served to inform Ulbrich that it had the same insurance coverage that the primary insured had for the [construction] project subject to all of the terms and exclusions within that policy"). *See also United Stationers Supply Co. v. Zurich Am. Ins. Co.*, 386 Ill. App. 3d 88, 102, 896 N.E.2d 425, 437 (1st Dist. 2008) (collecting cases) ("[W]here the certificate refers to the policy and expressly disclaims any coverage other than that contained in the policy itself, the courts [have] found that the policy should govern the extent and terms of the coverage.").

Vertex insists, however, that its claimed right to payment rests on "the Policy language, not the language of the Certificate." (Vertex Memo in Opposition to Assurance MSJ [149], at 18.) Vertex relies on the underlying Policy's Certificate of Insurance Clause:

> All parties to whom a Certificate of Insurance has been issued are automatically added to this policy under issuance of said Certificates, either as Loss Payee, or Mortgagee or any combination of same, in accordance with terms and conditions of said Certificates.
>
> Copies of all Certificates issued under this Policy will be filed with the Company, but no inadvertent error or omission in so filing certificate copies will prejudice either the Insured and/or the certificate holders. Such errors or omissions, if any, shall be corrected upon discovery by filing copies of such certificates with the Company.

---

[18] Unlike Ulbrich, which was listed as an "additional insured," Vertex was named a lender's loss payee. Neither party addresses whether that difference has any legal significance.

(Certificate of Insurance Clause, Exhibit 52 to National Union SOF [120-53], at PageID # 2574.) The court is not aware of, and the parties have not identified, any case containing identical language. Cases like *Pekin* direct, however, that the court honor this clause in the underlying Policy. In doing so here, the court finds that the Certificate of Insurance issued by Assurance added Vertex to the policy as a lender's loss payee on April 30, 2014. *Cf. Westfield Ins. Co. v. FCL Builders, Inc.*, 407 Ill. App. 3d 730, 735, 736–37, 948 N.E.2d 115, 118, 120–21 (1st Dist. 2011) (affirming a lower court's grant of summary judgment for an insurer, where a subcontractor's insurer issued a certificate of insurance listing a general contractor as an additional insured and containing the same disclaimer language as in *Pekin*, but there was no written agreement between the subcontractor and the additional insured, as required by the underlying insurance policy); *Old Republic Ins. Co. v. Gilbane Bldg. Co.*, 2014 IL App (1st) 123430-U, ¶ 30 (looking to the underlying insurance policy, as required by the disclaimer language in a certificate of insurance, and finding that "the policy language . . . does not require [the defendant] to be added as an additional insured"); *Sweis v. Travelers Cas. Ins. Co. of Am.*, 993 F. Supp. 2d 881, 882 (N.D. Ill. 2013) (finding a Certificate of Property Insurance issued to the plaintiff on his own insurance policy insufficient to establish coverage, when he conceded that the underlying policy did not "provide insurance coverage covering the claimed loss").

As noted in the background section above, Assurance seems to accept the fact that Vertex was, in fact, added to the Policy as a lender's loss payee via the Certificate of Insurance. (*See* Assurance Resp. to Vertex Add'l SOF [162] ¶ 25 ("[B]ased on the certificate of insurance, Vertex was listed as a Lender [sic] Loss Payee from April 30, 2014 until May 6, 2014 as indicated on the certificate of insurance.").) Assurance nevertheless raises an issue of timing, apparently contending that Vertex is limited to recovery of proceeds issued during the seven days it was listed on the Policy. The court does not agree that the May 6, 2014 expiration of Omega's National Union Policy preclude Vertex's recovery here. It is undisputed that National Union sent Omega insurance proceeds checks after May 6, 2014. Nothing about that date would have precluded

Vertex from receiving checks, either. And, as explained below, Assurance has not established that Vertex is precluded from recovering under the Policy, even though it was added as a lender's loss payee in April 2014, after the date of the Bango loss.

## III.    Vertex's Standing

Assurance asserts that Vertex lacks standing to bring this suit. Standing is the "right to seek judicial relief for an alleged injury." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). Assurance contends that "the evidence makes clear that Vertex could not have been a lender's loss payee under the subject policy . . . because [Vertex] was not a[n] [Omega] lender at the time of the [Bango insurance] claim." (Assurance Memo in Support of MSJ [129], at 12.) Therefore, Assurance claims that "Vertex has no standing to assert any right or interest in the . . . [National Union] claims proceeds." (*Id*.) The court disagrees. The evidence is far from clear about the implications of Vertex's status as a lender's loss payee.

Assurance relies on the testimony of Gregory Kuchinski, an employee of Risk Specialist Company Insurance Agency ("RSCIA") for its standing argument. RSCIA works with insurance "broker partners" as an agent of National Union to underwrite insurance policies, and RSCIA handled the policy in question for National Union. (Kuchinski Deposition, Exhibit J to Assurance SOF [128-10], at 7:19–8:19, 9:10–16, 22:23–23:1.) Mr. Kuchinski testified at his deposition that, "[i]n order to be considered a lenders [sic] loss payee" under National Union rules and procedures, "[the loss payee] would have to have an interest at the time of the loss." (*Id.* at 72:25–73:4; *see id.* at 72:16–19 ("You cannot acquire an insurable interest in a loss after [an] event, and an insurable interest cannot be transferred after a loss.").) Yet, Assurance has not pointed to any language in the insurance policy itself, nor to any other document, that would preclude Vertex from attaining an interest in insurance proceeds for a loss that occurred before it became a lender's loss payee. At least one Illinois decision casts doubt on Mr. Kuchinski's assertion. In *Fonda v. Gen. Cas. Co. of Illinois*, 279 Ill. App. 3d 894, 900, 665 N.E.2d 439, 442 (1st Dist. 1996), an insured property was destroyed by fire in December 1983, and the insurance proceeds were

paid directly to the property owner, even after notice from plaintiff, a secured creditor, that it was entitled to the payment. In an action for conversion brought by the creditor, the trial court entered judgment for the insurer, but the appellate court reversed, despite the fact that the secured creditor-plaintiff was not named as a loss payee until March 1984, three months after the loss. For its part, Assurance has offered no legal argument, nor has Assurance identified any contract provision that would bar Vertex from becoming a lender's loss payee on a prior loss. Assurance is not entitled to judgment as a matter of law on this issue.[19]

## IV.    Vertex's Alleged Damages

Assurance next argues that "Vertex has failed to show that it sustained any damages as a result of any alleged conduct by Assurance." (Assurance Memo in Support of MSJ [129], at 7.) There are genuine issues of material fact regarding the alleged damages, making this issue inappropriate for resolution on summary judgment.

All of Assurance's arguments here are fact-based: it argues that "all of the existing evidence clearly shows that Vertex knew and intended for the claim proceeds to be allocated to rebuilding the Bango facility and paying Omega's vendors and creditors" (Assurance's Memo in Support of MSJ [129], at 6), and that "the claim proceeds were in fact allocated for their intended purpose of rebuilding the facility and paying Omega's obligations." (*Id.* at 7.) But Vertex argues that, "[h]ad Assurance acted appropriately, . . . the payments for Business Interruption under the Policy [ ] would have been made to Vertex," and that payments to Vertex "would have resulted in

_____

[19]    Vertex characterizes its lender's loss payee status as an "assignment of claim proceeds." (Vertex Memo in Opposition to Assurance MSJ [149], at 21.) It states that "there is no dispute . . . that Omega executed an assignment of the claim proceeds to Vertex." (*Id.* at 23.) Assurance does dispute that Vertex is an assignee, however. (*See* Answer [23] ¶ 18.) There is an (undated) Assignment in the record, signed by Mr. Gregory and Mr. Silverberg (Assignment of Proceeds from Insurance Policy as Collateral Security, Exhibit N to Krier Declaration [126-14]), and Mr. Silverberg stated at his deposition that it is his "understanding" that Vertex had a secured interest in the insurance policy proceeds stemming from the Bango loss. (Silverberg Deposition, Exhibit 1 to National Union SOF [120-2], at 182:18–23.)

the balance of the Secured Promissory Note to be paid down." (Vertex Memo in Opposition to Assurance MSJ [149], at 3; Vertex SOF [123] ¶ 31. *See id.* at 5 (disputing Assurance's characterization of the evidence as indicating that Vertex CEO Carlson understood that "any and all insurance payments would be made to and used in Omega's operations").) Whether, if paid to Vertex, the business interruption proceeds would have been used to rebuild the Bango facility and/or to pay off Omega's other creditors is unclear. Viewing the facts in the light most favorable to the non-moving party, there is a genuine dispute of material fact regarding the purpose of the lender's loss payee designation, and what the business interruption proceeds were to be used for.

Assurance also argues that Vertex ultimately profited by declining to close on the Omega deal; in 2015, Vertex entered into a separate deal with the landowner of the Bango facility and eventually bought and re-sold the facility.[20] (Assurance's Memo in Support of MSJ [129], at 7.) According to Assurance, Vertex "increased its cash reserves from $4 million to $10 million as a result of the ultimate sale of the Bango Property." (Assurance Memo in Support of MSJ [129], at 7.) As Vertex points out, however, Assurance's support for this claim is Vertex's public disclosure of increased cash reserves during the period in which the sale took place. (Vertex Memo in Opposition to Assurance MSJ [149], at 6; Press Release, Exhibit 60 to National Union SOF [120-61].) The relevant press release does not directly connect Vertex's increased cash reserves to the Bango sale. Vertex contends it in fact incurred losses from its ultimate operation and sale of the Bango Facility in the amount of $8,296,189. (Assurance Resp. to Vertex Add'l SOF [162] ¶ 75.) These material facts, too, are in dispute.

---

[20]     Neither party clearly explains the ownership structure of the leases on or ownership of the Bango facility. For a brief explanation of this transaction, see Assurance Resp. to Vertex Add'l SOF [162] ¶ 74.

## V.    Ratification

Assurance asserts ratification as an affirmative defense.  It argues that Vertex "had full knowledge and notice of all [National Union] claim payments" to Omega because Carlson, Gregory, and Peel knew that Omega was receiving business interruption insurance checks. (Assurance Memo in Support of MSJ [129], at 10.)  Because Vertex "never objected to any of the checks nor ever requested that the checks include Vertex as a payee," Assurance contends that "Vertex effectively ratified all claim payments made to Omega by National Union . . . and, thus, is precluded from recovering any damages . . . ." (*Id.*).

Without any explanation from Assurance about the legal basis for this argument,[21] the court interprets it to be one of agency.  "Agency is a fiduciary relationship in which the agent has the power to act on the principal's behalf."  *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004).  " 'An agent's authority may be either actual or apparent' . . . However, '[o]nly the alleged principal's words and conduct, not those of the alleged agent, establish the agent's authority.'"  *Id.* (quoting *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc*., 326 Ill. App. 3d 126, 134, 759 N.E.2d 174, 181 (2nd Dist. 2001)).

Under the laws of agency, a principal may be bound by a contract entered into by its agent if the principal ratifies the contract.  "A principal can ratify his agent's actions either by not repudiating them or by accepting their benefit."  *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 677 (7th Cir. 2004) (quoting *Amcore Bank, N.A.,* 326 Ill. App. 3d at 140, 759 N.E.2d at 185).  "Ratification requires 'that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction.'"  *NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A & A Drug Co*., 736 F.3d 1054, 1059 (7th Cir. 2013) (quoting *Sphere Drake*, 376 F.3d at 677).  When the principal is a corporation, agency law assumes that

---

[21]    After Vertex's response brief argued that Assurance's failure to provide a legal basis for this argument, Assurance still failed to provide any further explanation of its ratification defense in its Reply Brief [160].

"corporations 'know' what their employees know—at least, what employees know on subjects within the scope of their duties." *NECA-IBEW Rockford Local Union*, 736 F.3d at 1059 (quoting *Prime Eagle Group Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 378–79 (7th Cir.2010)).

Assurance appears to argue that Carlson, Gregory, and Peel are agents of principal Vertex who knew of and failed to object to National Union's failure to name Vertex on the business interruption insurance checks. Even if those individuals can be categorized as agents of Vertex (or as principals)—an analysis which Assurance has not provided—Vertex has raised questions about these individuals' knowledge and has provided evidence that they were working on behalf of Omega when dealing with the insurance claim. Without undisputed proof that the principal had "full knowledge of the facts," Assurance is not entitled to summary judgment on its ratification defense.[22] *NECA-IBEW Rockford Local Union*, 736 F.3d at 1059 (internal quotation marks and citation omitted).

The court recognizes that Gregory himself signed some of the proofs of loss, and that he sat simultaneously on the boards of directors of Omega and Vertex, but Vertex has provided evidence that Gregory was acting exclusively on behalf of Omega in all pertinent instances. (*See* Vertex Resp. to Assurance SOF [147] ¶ 15.) Assurance has not explained the legal implications of these allegedly dual roles, nor how they would affect its ratification argument. Vertex further asserts that "Peel was [ ] unaware that Vertex had received an assignment of the business interruption insurance proceeds or otherwise had a security interest in the proceeds," suggesting that he lacked the requisite knowledge for ratification. (Vertex Resp. to Assurance SOF [147] ¶ 29.) Finally, Carlson testified that he did not read Ek's financial reports and had no knowledge

---

[22]    Vertex argues that the ratification defense is wholly inapplicable here because ratification requires the agent's action to have been "done on [the principal's] behalf . . . ." (Vertex Memo in Opposition to Assurance's MSJ [149], at 9 (quoting *Old. Sec. Life Ins. Co. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 740 F.2d 1384, 1392 (7th Cir. 1984)).) This argument runs into the same problem as Assurance's—which agent was acting on which company's behalf, and when, is in dispute.

of Omega's receipt of the business interruption proceeds checks in 2014. Carlson's failure to review relevant records in his role as CFO of Vertex may be suspect, but the court concludes his assertions confirm that there are genuine issues of fact precluding summary judgment on this defense.

## VI.    Duty

Finally, Assurance argues that it owed no duty to Vertex, given that Assurance and Vertex "had no relationship of any kind." (Assurance Memo in Support of MSJ [129], at 10.) This court determined in a prior opinion that 735 Ill. Comp. Stat. 5/2-2201(a) "imposes a duty of care upon Assurance, so Assurance . . . may be liable for a breach of that duty, independent of any contract claim." *Vertex Ref., NV, LLC v. Nat'l Union Fire Ins., Co. of Pittsburgh,* No. 16 CV 3498, 2017 WL 977000, at *4 (N.D. Ill. Mar. 14, 2017) (collecting cases). In the same opinion, the court further found that "Assurance had an extracontractual duty to communicate accurate information to Vertex." *Id.* at *6. The court is willing to reconsider its own earlier determinations, if guided by counsel to recognize error. But despite having access to the court's rulings for many months, Assurance made no effort to refute them in its Memorandum in Support of its Motion for Summary Judgment [129]. It cites no case, statute, or evidence from the record in its seven-line argument.[23] *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir.) *opinion amended on denial of reh'g*, 387 F.

---

[23]    Assurance *does* attempt to make a legal argument regarding its duty to Vertex in its reply brief [160], after Vertex's Memorandum in Opposition to Assurance's Motion for Summary Judgment [149] recalled the court's prior findings. Assurance had ample opportunity to address the issue of duty in its first filing, however, and the court will not entertain its arguments raised for the first time in its reply brief. Assurance is reminded that "[t]he purpose of the reply brief is to respond directly to matters raised in the response brief and not to introduce new factual or legal arguments." *Ace Novelty Co. v. Vijuk Equip., Inc.*, No. 90 C 3116, 1991 WL 150191, at *4 (N.D. Ill. July 31, 1991); *see also James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998) ("Arguments raised for the first time in a reply brief are waived.").

Similarly, Assurance raises arguments about Vertex's claims of negligent misrepresentation and breach of contract for the first time in its reply brief. (Assurance Reply Brief in Support of its Motion for Summary Judgment [160], at 7–8, 9–10.) Those arguments are also improperly raised on reply and will not be considered here.

App'x 629 (7th Cir. 2010) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (citation omitted). The court stands by its past rulings, without determining whether Assurance may owe Vertex any additional duties. This is sufficient to defeat summary judgment.

## **CONCLUSION**

Assurance has failed to establish that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a)). Therefore, Assurance's motion for summary judgment [121] is denied.

ENTER:

Dated: March 19, 2019
_____
REBECCA R. PALLMEYER
United States District Judge